Good morning, Your Honor. Robert DuPont appearing on behalf of Zhao Ying Zhu. I'd like to reserve rebuttal time at the end of this. Basically, Your Honor, we filed this appeal contesting the decision, both decisions, of the immigration judge in which, one, he has not found persecution of Mrs. Zhu. In a general sense, well found a fear of persecution. And on a second level, failure to find that she qualifies for relief under OIRA, under the one-child policies of the People's Republic of China. We, the record will reflect that there is ample evidence, applied and consistent evidence, from Mrs. Zhu showing that she was subjected repeatedly, first in 1996, then in 1999, to forceful abortions. And sterilization on top of that. I have quite a number of difficulties with this case, but I'd like to hear from you why at least two of the credibility findings that the IJ made aren't supported and why they're not sufficient to uphold the decision. And those two that I'd like to hear your best argument on are basically that she, it was just implausible that she came to this country or left China on account of the abortion policies. And in order to become pregnant again, because she had been sterilized and couldn't and her husband wasn't here and he was the reason that they wanted a son. And it just didn't make, it didn't compute. And the second prong of the credibility finding that he made that seems also to have some support and to make some sense is that it was implausible that she involuntarily had the third, or that her third pregnancy was aborted involuntarily. Because she went to work and walked right into the examination room where she knew it would be discovered. So those are the two things I'd like to hear your best argument on. Okay, Your Honor, and I'm glad you asked those two questions. First, as just a general principle, credibility findings need to be relevant and apply to the elements we're trying to fulfill here. And so when we get into a discussion of what are your reasons for leaving the United States, that is not directly relevant to were you in fact subjected to persecution. What are your reasons for coming to the United States? Well, I would think that that's wholly relevant. I mean, a good credibility finding or not, I'm not going to talk about right now. I just want to hear your best argument. We have an excellent response to that. I do just think the Court should, in its mind, parse the issues. There was clearly stated on the record eight reasons for leaving the United States, not just one. Eight reasons for leaving China. First, she stated discrimination against her family on two continents, conscription of her father, I mean, on two generations, conscription of the father into the Communist Army forced defeat. Let me just try to help a little bit here. I understand, I've read the record, and I understand all the reasons she gave. What I'm asking you is your best shot as to those two, from which you might be able to discern that those are the two that I'm most troubled about. Well, I'm troubled because there's a mischaracterization about her reasons for leaving. You know, you're either going to answer the questions or you're not. Are you paying attention to the questions? Okay.  For her, if you may, at 10 years old she was subjected to property seizure. She saw half her family taken away from her. She was sent to forced labor camp for five years. She's had two forced sterilization, I mean, abortions and sterilization. She's full knowledge that her government has labeled her family to contain the five black elements and appears to be a basis for ongoing persecution. She stated, I left the country because I hate the system. I left the country because I want human rights. I left the country because I hope to have a son. How could she hope to have a son when she had been sterilized? Well, Your Honor. And her testimony was she didn't know that the procedure was potentially reversible until she got to the United States. Well, Your Honor, I think this is where we have an improper line of questioning by the immigration judge. She may have faith in God. She may have faith in the American medical system. She may have thought if I can just get out, plead for asylum, bring my family with me, that I can have a sterilization procedure reversed. But she's not, she doesn't have a doctorate. She doesn't have medical knowledge. All she knows is what people can tell her. And she was forthright in telling the court once I got here I was informed that I could have this procedure reversed. What I want to stress is that the court has seized upon, the immigration court seized upon this one tiny element when she has stated eight clear reasons of why she left her country. And I can't think of anything more eloquent than saying I hate my government. I mean, it's there on the record. C.A.R. 346. What about the second reason that Judge Reimer asked about, the involuntary third, or termination of the third pregnancy? The I.J. found that implausible because she, that the pregnancy was involuntarily terminated because she went to work. How do you respond to that in terms of credibility? Here again we have a mischaracterization in the record because the, Ms. Zhu clearly stated I had to live. I went back to work because I had to live. I had no choice. I needed money. It's there in the record. She was compelled by economic circumstances to go back to work. So your argument is that she understood she was taking a risk and needed to go back to work and the I.J. To have a husband and a child, there are other family issues for her and her own survival. Right. Well, the I.J. seemed to say that, well, she voluntarily submitted to an examination knowing that it would result in a termination of the pregnancy. What's your response to that? I can't imagine how that can be voluntary if it's a condition of you going to work and knowing that you will be fired if you don't comply is submitting to pregnancy tests. And as a male, I'm not subject to that, but I can imagine that's not a voluntary condition. That's compulsion. And here we have a unique situation. You're in the People's Republic of China. Your employer is also your government. It's the same government that's taken away their property, forced conscription of a father, forced this lady to go to labor camp for five years. She's fully cognizant of the kind of power that the People's Republic of China wielded over her. And I think it's a gross misunderstanding of what she was going through to characterize her return to work as voluntary or submission to the pregnancy test as voluntary. You have 40 seconds to go. Yeah. I think I hit most of my talking points with those questions, and I thank you for listening. All right. Go ahead. May it please the Court. My name is Robin Bly. I represent the Attorney General in this matter. Ms. Bly, I have, putting aside for a moment the bottom line, I have an awful lot of difficulty with the way the hearing was conducted. It strikes me that the immigration judge was fairly boorish about the way he proceeded to take over the examination. The record is a total mess in terms of trying to ascertain what really happened when. And part of that may be attributable to the way the hearing was conducted. And I have a good deal of difficulty with one of the things that the immigration judge said, which either could be a credibility determination or could be amusing, and that is the implausibility of her becoming pregnant the third time so quickly after having had the second, having had her second pregnancy aborted, because there's absolutely no support in the record for that kind of implausibility assumption. And I'm not so sure that it's implausible mechanically anyway. So those are just in general the concerns I've gotten. I would appreciate your responding to them. Well, Your Honor, as this Court's aware, the board affirmed without opinion the decision of the immigration judge, the second decision of the immigration judge, I should be more clear. Because this was the second one, the first time the BIA sent it back with specific instructions. That's correct, that's correct, to consider the new law and to make a specific credibility finding. That was the first BIA decision. So when the board does that, it doesn't necessarily approve of every reason that the immigration judge gives, but approves of the outcome. I mean, reading that, there's nothing to indicate that this judge is a doctor or anything like that that would indicate that he knew. It may be just speculation on his part, but the alien has the burden of filling in the gaps and explaining these things. And she had said that she had had serious problems after her first abortion. I don't know that that necessarily explains this immigration judge's ---- Well, no, but he just kind of pulled it out of thin air and said, you know, I just think it's ---- I can't believe that after having had the abortion in December that you could have gotten pregnant again in February. Well, I mean, without putting too fine a point on it, I don't see why not. But it's not ---- it's neither for me nor him to say. There's nothing in the record, one way or the other, that would support either surmise. Well, Your Honor, as I indicated before, when the board affirms without opinion, as this Court is well aware from its Creechia decision, it doesn't necessarily adopt every reason that the immigration judge gives. So you're not defending that reason? No, I'm not, Your Honor. So here's what I think my concern is about. It's similar. It struck me in reading this that what ---- I.J. gets it back and says with instructions to make a credibility finding, and it seems as though I.J. said, all right, you want credibility findings? I'm going to make some credibility findings, and I'm going to pick on this person, and I'm going to pick apart her story until I find ---- I can shake something loose that I can hang my hat on. That's kind of the impression you get from the record rather than, all right, let's hear your evidence, and I'm going to make a finding. Well, Your Honor, I don't ---- I'm just giving my impression of it so you can respond to it. I don't ---- I wouldn't characterize it as her being picked on. She ---- the questions were asked. She was very evasive during those. She didn't give answers. They had to be asked several times. She didn't give specific answers. And then when she did, they were inconsistent with previous testimony or evidence in the record. Specifically ---- Well, you know, she's through a translator, right? Yes. And it's sort of a complicated hypothetical, saying why would the government do this, why would the government do that. So ---- Well, but, Your Honor, there's no indication that there was any problem with the translator. I'm not sure if that's what you're trying to indicate, but there's no indication ---- she's made no indication whatsoever that there was any problem with the translation of the hearings or anything to that extent. No, I was making a slightly different point, was that in translating, it's one thing to say what happened next and then what did you do and did you seek that and make ---- hear the answers and make credibility determinations from that. It's quite another to sort of construct a complex layered question and hope that through translation that you're going to get an accurate response. Well, I think, Your Honor, in parts of the ---- I mean, I guess what I'm saying is when you say you're evasive, so forth, I think, well, you know, I'm not sure she was quite getting what was going on or answering as best she could. We see that type of answer in response to hypotheticals all the time when people are speaking the same language. Well, Your Honor, with all due respect, I think that's speculation on the part of the Court because ---- No, no, no. I'm just giving you an impression. That she was having any trouble understanding the questions or anything like that. And I believe even before the hearing started and got into all the facts and everything, she was told that if she didn't understand something, to let them know so that it could be clarified. Right. But, I mean, some of the questions were something to factor. Well, why would the government do this? It's not logical that the government do this because X, X, Y, and Z. Now, I don't know. I mean, she wouldn't know why the government would do that. I mean, it was ---- necessarily. And so she gave an answer that was inconclusive. But I'm not sure that I take it as a basis. But my central point is it seemed to me that the manner of examination of this case was a little more pointed and harsh than we see in other cases. Your Honor, he did ---- I mean, he did get into some areas that maybe another immigration judge wouldn't have gotten into. I'll admit that. It really does seem that the immigration ---- one could make a case on the basis of this transcript and this record that the immigration judge was hostile to this petitioner because the judge was irked that the lawyer had gone to the BIA and got this sent back. For example, I'm sure you've read this thing, judge to respondent, well, your lawyer wants the details. Why did the judge say that? Like, you want the details? You're getting the details. And then there's this long list of very sharp questions. Your lawyer wants the details. And then they run away and then over here he says, okay, well, Mr. Kang, go ahead. Mr. Kang to respondent, did they give you anesthesia, judge to Mr. Kang? No, she said no. Answer, she said no. Questions, she said no. Answer by the lawyer, I'm sorry, okay. She said she was in discomfort. The judge butts in, I mean, about every two lines to anything that the lawyer tries to ask. Your Honor ---- Did you get that impression? No. I got the impression that the immigration judge was trying to find out what had happened and wasn't necessarily getting the information he needed to make his decision. Immigration judges are permitted, as the court knows, to ask questions to clarify the points. It was her burden, and obviously the immigration judge didn't think she was meeting her burden of showing that she was being persecuted in China. I mean, he rendered a decision finding that substantial evidence in this record didn't compel another conclusion. How many questions did the petitioner's lawyer get out before the judge started asking questions? Your Honor, I couldn't answer that. The answer is zero. The judge has started asking questions at the hearing. Goes through, how long did you live, what did you do, blah, blah, blah, blah, blah, goes through a couple pages. Then says, okay, you can start. And then interrupts within four questions. Well, Your Honor, I think ---- I'm just saying that that's not a bench trial. You wouldn't expect that to happen. Well, in fairness, I think the beginning questions were just basic information about her, where she was from, her birth date, things like that, that sometimes lawyers forget about, and then it comes up later. Right. But this time, they didn't even get, you know, the judge didn't say, you didn't get the background information I needed. They just started off. Well, Your Honor ---- I mean, the petitioner has the burden. Petitioner's case, it's not necessarily judge's. And I take the point that sometimes a judge needs to direct things to get a more ---- get to the relevant points, but ---- I mean, in fairness, Your Honor, this judge may have been considered a little hostile, but I think as lawyers, we've always appeared before some judge has been hostile, but it's never been to the point that it's been. I mean, I don't think that you can honestly say because there may be ---- and I don't think he was hostile in this. I think he was just maybe frustrated because answers weren't getting ---- questions weren't getting answered. I don't know necessarily that he was taking out his hostilities on this petitioner. I just think that he wanted the answers answered. Right. But I think then when you couple that with at least one credibility finding that seems to be a pull out of thin air, then it does create an impression that there was a biased hearing going on. Well, Your Honor, I think there were other credibility findings in this record that support the immigration judge's finding, particularly her statement that she was coming to the United States to have a son when she herself had testified she had been sterilized prior to coming and didn't know until she got to the U.S. that this procedure may be reversed. And there were ---- the immigration judge pointed out other reasons. I grant you that the statement about her ability to get pregnant the third time before her third abortion or second abortion, I'm sorry. As I said, the board's decision was affirmed without opinion, and under that ---- No, I understand what your argument is. But let's assume that we take two credibility findings that seem to be supported. Is that enough for us to conclude that we should disbelieve her on everything else, including the fourth?  I understand the standard of review, but I'm just talking about as a matter of common sense. Well, Your Honor, I think ---- Give me your best argument why that would be sufficient, standing alone to disbelieve all of her testimony about past persecution. Your Honor, if I remember correctly, I think it's this Court's decision in Wang that says that it only takes one point to establish a lack of credibility. Well, it has to be relevant, though, too. So if you're just saying you can trip them up on one thing, we can reject it. I think we've not held that. I mean, I think it is relevant why she came to the United States. Moreover, there's evidence in the record, like when you compare the profile or the State Department report, that says that abortion certificates are given only when a person undergoes them voluntarily. She has two abortion certificates in this record. So that seems to indicate, when you compare it with the State Department reports, that she may not have gone necessarily ---- this may not have been forced upon her. These abortions may not have been forced upon her. Plus her actions during the second pregnancy where she claims that she was in hiding at one point in the record, she said, when she was recovering from her first abortion and missed an examination. But then later on, the next month, she goes to work where she admitted she knew it was going to be determined that she was pregnant because she already knew. I mean, that just doesn't ---- You've heard the explanation given today. Your Honor, I just don't think ---- I mean, I think that the immigration judge's finding was based on it just didn't make sense and that the evidence didn't support what she was saying, that substantial evidence in the record didn't compel another conclusion, a different conclusion. I see that my time has come all over. If there are any further questions, otherwise we'd ask that the immigration judge's Thank you, Counsel. If you care to respond, we'll give you a minute. Your Honor, I think the point is well worth looking at in terms of hostility and frustration from the judge, and I don't believe it's from any deliberate actions or evasiveness on behalf of Ms. Zhu. And I think one of the more telling questions from the judge is do you understand the question? It's asked again at five separate times in one hearing. It's in the CAR at 67, 69, 70, 83, and 84. Another indication that the translation may not have been the best was Pelle's counsel at page 342, CAR 342, had to correct the record and say, I believe my client is saying confiscated, not searched. So and then the other more subtle point that has also been raised is where does a judge cross the line? When are they able to just ask questions, get factual background? When are they acting as a prosecutor? I submit that I believe Judge Einhorn was a prosecutor before he took the bench, and may have slipped back into some old habits. But I think the other thing that's telling is his own question at page 372, where he says, I think you're being evasive, and makes the threat. I will find you not credible if you can't answer my questions. And, you know, the threat coupled with just the open scoffing where she's calling her and difficult subject matter I can imagine for a witness to deal with on a stand. It was very inappropriate. And I'll close with that. Thank you, counsel. This case is order submitted. The next case, Suhadi, is order submitted, as is Tan, Goeji, and Soeth, taking us to the next case.
judges: Trott, Rymer, Thomas